**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
In re                                                                    Chapter 11

AMPLE HILLS HOLDINGS, INC., *et al.*,            Case No. 20-41559 (____)

                        Debtors.[1]            (Joint Administration Requested)
---------------------------------------------------------- x

**DECLARATION OF DANIEL SCOULER**
**UNDER RULE 1007-4 OF LOCAL BANKRUPTCY RULES FOR THE UNITED**
**STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK**

I, Daniel Scouler, make this declaration under 28 U.S.C. § 1746:

1. I am a principal with the firm of Scouler Kirchhein, LLC ("<u>Scouler</u>"), which maintains offices at 230 Park Avenue, 3rd Floor, New York, NY 10169. I am duly authorized to make this Declaration on behalf of Scouler, the proposed Chief Restructuring Officer to the above-captioned Debtors.

2. Scouler has amassed over 45 years of experience in the restructuring industry, and provides financial advisory services to parties-in-interest in the restructuring process, both in and out of court. Scouler has experience working with debtors and debtors-in-possession, across industries, through the chapter 11 process effectuating swift resolutions for the benefit of all stakeholders. Personally, I have 45 years of experience assisting companies experiencing financial difficulty. Before joining Scouler, I was the Principal and Head of Glass Ratner's New York City

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Ample Hills Astoria, LLC (3001); Ample Hills Aventura, LLC (4022); Ample Hills Chelsea, LLC (1803); Ample Hills Creamery, Inc. (9650); Ample Hills Essex Street Market, LLC (8522); Ample Hills Fireboat House, LLC (6699); Ample Hills Gowanus, LLC (2450); Ample Hills Highline, LLC (0197); Ample Hills Jersey City, LLC (7428); Ample Hills LBV, LLC (6652); Ample Hills Manufacturing, LLC (5506); Ample Hills PPW, LLC (2968); Ample Hills Red Hook, LLC (4518); Ample Hills Vanderbilt, LLC (7255); Ample Hills Wholesale Online, LLC (3008).

1

office. Prior to Glass Ratner, I was a Managing Director in the Los Angeles office of Alvarez & Marsal.

3. On February 10, 2020, Scouler was engaged by Ample Hills Holdings, Inc. ("Holdings") and its debtor affiliates (collectively, the "Debtors" or "Ample") to, among other things, assist Ample and its financial, legal, and operational advisors and other professionals with Ample's evaluation and development of strategic alternatives and negotiations with its creditors.

4. Effective as of the Petition Date (defined herein), I was appointed as the Chief Restructuring Officer ("CRO") of Holdings and its affiliated debtors and debtors in possession in connection with the above-captioned chapter 11 cases. As CRO, I report and provide strategic advice to the Company's Board of Directors and Chief Executive Officer in connection with the Debtors' chapter 11 cases, and I am responsible for carrying out the Debtors' chapter 11 strategy and objectives described herein and in the Smith Declaration (defined below), filed contemporaneously herewith.

5. On the date hereof (the "Petition Date"), each of the Debtors commenced with this court (the "Court") a voluntary case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Court"). I am knowledgeable and familiar with Ample's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases").

6. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of Scouler or Ample, or advisors and counsel to Ample, or my opinion based upon my

experience, knowledge, and information concerning Ample's operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7. This Declaration is submitted pursuant to Rule 1007-4 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules") for the purpose of apprising the Court and parties in interest of the circumstances that led to the commencement of these Chapter 11 Cases and in support of the motions and applications that the Debtors have filed with the Court, including the "first day motions" (the "First Day Pleadings"). I am authorized to submit this Declaration on behalf of the Debtors. I understand that the Debtors have also submitted *Declaration of Phillip Brian David Smith Pursuant to Rule 1007-4 of Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of New York* (the "Smith Declaration," and together with this Declaration, the "First Day Declarations"), which has been filed with this Court contemporaneously herewith.

8. Section I provides an overview of these Chapter 11 Cases. Section II provides a summary of the First Day Pleadings and factual bases for the relief requested therein.

## OVERVIEW

9. As described in more detail in the Smith Declaration, time is of the essence in these Chapter 11 Cases. By late 2019, the Debtors had limited liquidity and were at risk of exhausting their cash. The Debtors' current limited liquidity is comprised of roughly $100,000 cash on hand as of the date hereof. In the weeks leading up to the commencement of these Chapter 11 Cases, the Debtors' continued financial challenges became known to their creditors. As a result, Ample has been forced to address vendor termination and contraction of terms. Indeed, some suppliers and vendors have demanded that the Debtors pay cash in advance as a condition for further deliveries, further compounding the Debtors' liquidity issues. The Debtors have also been served

with default notices and litigation claims based on alleged failures to pay various amounts claimed to be due. The Chapter 11 Cases, among other things, will provide the Debtors a much-needed reprieve from their significant liquidity issues. Indeed, the Debtors and their advisors estimate that they could not have continued operating their businesses past the Petition Date. Filing the Chapter 11 Cases was essential to allowing the Debtors to implement an auction and an eventual sale of their assets (the "Sale Strategy") and to maximize value, as further stated in the Debtors' Sale Motion,[2] which is filed contemporaneously with this Declaration.

10. As described in further detail in the Smith Declaration, Ample's rapidly diminishing liquidity requires the Debtors to have immediate use of Cash Collateral to operate their business, which includes paying their employees. Given the costs associated with continued operations, a quick Chapter 11 Case is essential to preserve the value of the Debtors' businesses for the benefit of the estates and all of the stakeholders, and to prevent immediate and irreparable harm to the Debtors' estates and creditors.

## FIRST DAY PLEADINGS

11. Ample is a Brooklyn-based produced, distributor, and retailer of high-quality ice cream and related merchandise. It currently operates ten (10) retail stores and kiosks, which are primarily located in the metropolitan New York area, and a factory in the Red Hook neighborhood of Brooklyn. There is also one store at Disney's Boardwalk in Orlando (which is owned and operated by Disney). Due to its fragile financial condition, Ample must make a seamless transition into chapter 11 to preserve the reputation of its business and the loyalty and goodwill of customers, suppliers, and employees. Sales and operations must continue in the ordinary course of business to preserve the value of the business and implement a strategic asset sale. The Debtors have filed

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Smith Declaration.

several First Day Pleadings[3] designed to facilitate their swift transition into these Chapter 11 Cases.[4]

12.     I have reviewed each of the First Day Pleadings with the Debtors' proposed counsel and Ample's management. I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above. The relief sought is necessary to the Debtors' ability to administer these Chapter 11 Cases and is in the best interests of the Debtors' estates and creditors. I adopt and affirm the factual representations contained in each of the First Day Pleadings.  A brief description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

### A. Administrative Motions

#### i. *Motion for Joint Administration*

13.     The Debtors request that the Court enter an order directing joint administration of these Chapter 11 Cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b), and maintain one file and one docket for each of the Chapter 11 Cases under the lead case, Ample Hills Holdings, Inc. Joint administration of these Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce costs by avoiding duplicative filings objections, notices, and hearings, and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

---

[3] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleading.

[4] Some of the First Day Pleadings have been filed contemporaneously with this Declaration. First Day Pleadings that have not been filed as of the date of this Declaration will be filed shortly.

### ii. *Motion Extending Time to File Schedules and SOFA's*

14. The Debtors request entry of an order granting a 30-day extension (without prejudice to further extension) to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases (the "Schedules"), and statements of financial affairs (the "SOFA's").

15. To prepare the Schedules, the Debtors must carefully review and compile information from their books and records. This task requires a substantial expenditure of time and effort on the part of the Debtors, who have a small management team. While the Debtors, with the assistance of their professional advisors, are mobilizing to work diligently and expeditiously on preparing the Schedules, the Debtors' resources are limited and strained.

16. The number of creditors likely to be involved in these Chapter 11 Cases, the geographical spread of the Debtors' operations, and the numerous critical operational matters that must be addressed by the Debtors' management all contribute to the load that the Debtors must carry at the beginning of these Cases. An extension to file the Schedules is necessary and appropriate and will ultimately maximize the value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

### iii. *Motion (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors; (B) File a Consolidated List of the Debtor's Thirty Largest Unsecured Creditors, (II) Redact Certain Personal Identification Information of Individual Creditors and Employees, and (III) Approving Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases*

17. Each of the Debtors has a large number of creditors and parties in interest, and many of the Debtors' creditors and parties in interests have interests in multiple Debtors. The preparation of separate lists of creditors for each of the Debtors would be expensive, time consuming, and administratively burdensome. Therefore, the Debtors respectfully request

authority to file one consolidated creditor matrix for all Debtors. Permitting the Debtors to maintain one single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor entity is warranted under the circumstances of these Chapter 11 Cases and will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and to reduce the potential for duplicate mailings. Further, given the affiliated nature of the Debtors, the Debtors believe that filing a consolidated list of the Debtors' top thirty (30) creditors would facilitate the U.S. Trustee's review of creditors' claims and appointment of a single unsecured creditors committee in these Chapter 11 Cases.

18.     There is cause to authorize the Debtors to redact address information of individual creditors—many of whom are the Debtors' employees—from the creditor list because such information is sensitive, could be used to perpetrate identity theft, and is unnecessary to disclose. The Debtors will provide an unredacted copy of the Consolidated Creditor Matrix to the Court, the Office of the United States Trustee for the Eastern District of New York, and counsel to the official committee of unsecured creditors, if one is appointed in these Chapter 11 Cases, upon request.

19.     Further, the Debtors seek to serve a single Notice of Commencement of the Debtors' Chapter 11 Cases on all parties in interest. Service of a single Notice of Commencement will not only avoid confusion among creditors but also prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Consolidated Creditor Matrix. This will maximize the efficiency and orderly administration of these Chapter 11 Cases, while ensuring that appropriate notice is provided.

### B. Operational Motions Requesting Immediate Relief

20.     The Debtors intend to ask for immediate relief with respect to the following First Day Pleadings and, therefore, will present these motions at the "first day" hearing.

> *i.  Motion of Debtors for an Order Authorizing Them to (I) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, (III) Continue Employee Benefits Programs, and (IV) Related Relief*

21.  The Debtors request the entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries and other compensation, taxes, withholdings and related costs and reimbursable employee expenses, (ii) pay and honor obligations relating to employee medical, insurance, and other benefits programs, and continue their employee medical, insurance, and other benefits programs on a post-petition basis, and (iii) related relief. The relief requested includes compensation for the Debtors' full-time and part-time Employees. The Debtors pay their Employees on a weekly basis. The Debtors' payroll obligations generally include wages, salaries, and payments on account of used vacation time and other paid time off. Historically, on average, the Debtors' monthly gross payroll has varied seasonally, and has been approximately $900,000.00 during the summer months and $450,000.00 during the rest of the year, inclusive of applicable Payroll Taxes. The Debtors have cut down their workforce considerably, and in the coming weeks, the Debtors anticipate that their monthly gross payroll will be approximately $750,000 during the summer months and $325,000 during the rest of the year, inclusive of applicable Payroll Taxes per weekly pay period. The majority of the Debtors' payroll is made by utilizing the services of Insperity PEO Services, L.P. ("Insperity"). The Debtors have a co-employment relationship with Insperity, whereby Insperity serves as the legal co-employer of the Employees pursuant to a Client Service Agreement and handles certain administrative responsibilities for human-resources related functions, including payroll tax filing services, maintaining employee data, payroll processing, timekeeping for hourly employees, and employee benefits. The Debtors believe that, as of the Petition Date, they do not owe Insperity any pre-petition amounts on account of these services. The Debtors estimate, however, that as of the

Petition Date, they owe approximately $90,000 to Employees on account of prepetition payroll obligations, including accrued but unpaid wages and salaries (the "Unpaid Compensation") (including issued but uncashed checks). The Debtors do not believe that any Employee is owed Unpaid Compensation in an amount exceeding the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

22. The majority of the Debtors' Employees rely heavily on the Debtors' compensation, benefits, and reimbursement of expenses to satisfy daily living expenses. The workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, morale and loyalty will be jeopardized at a time when such support is critical. In the absence of such payments, Employees may seek alternative employment opportunities, including with the Debtors' competitors, hindering the Debtors' ability to meet their customer obligations and likely diminishing customer confidence. Employee attrition would cause the Debtors to inure additional expenses to find appropriate and experienced replacements. Additionally, loss of valuable employees would distract the Debtors from focusing on their operations and administering the Chapter 11 Cases at this critical juncture.

### ii. *Debtors' Motion for Entry of an Interim Order Authorizing Use of Cash Collateral and Scheduling a Hearing to Consider the Entry of a Final Order Authorizing Use of Cash Collateral*

23. By way of their Motion to Use Cash Collateral, the Debtors seek entry of an Interim Order authorizing the Debtors' use of cash collateral of Flushing Bank (the "Lender"). The Debtors require immediate authority to use cash collateral in order to continue their business operations (including paying their employees) without interruption towards the objective of the eventual sale of their business. The Debtors hope that an eventual sale will result in proceeds that they can

distribute to creditors, but such a sale will not be possible if the Debtors are forced to shut their doors and discontinue serving their customers.

24. To enable the Debtors to continue fulfilling the needs of their customers and to avoid a disruption of theirs and their clients' business operations and any potential impact on their clients' reputations in their respective industries, the Debtors require the use of cash collateral for the continuation of their operations. Without authorization to use cash collateral in accordance with the Debtors' budget, the Debtors' operations will cease to the detriment of all parties involved, including the Lender, the Debtors' employees, customers, and creditors.[5]

25. The need for the Debtors' immediate use of the Cash Collateral and for the relief requested in the Interim Order is best illustrated by the Debtors' expenditures forecast in the Budget. The Debtors' Budget, as further described in the Cash Collateral Motion, demonstrates that during the initial four-week period after the filing of these Chapter 11 Cases (the "Interim Period"), the Debtors anticipate that they will collect approximately $527,800 in cash. The Budget also sets forth the weekly expenditures required by the Debtors and project cash disbursements totaling $644,800 during the Interim Period. The bulk of these disbursements represent payments related to payroll and other employee-related obligations, utilities, the purchase of inventory and supplies, and all other expenses necessary for the Debtors' continued post-petition operations. Indeed, the next scheduled payroll payment is Tuesday, March 17, 2020. The Budget demonstrates the Debtors need for use of Cash Collateral during the Interim Period. The Debtors believe that they can operate their business during the Interim Period using Cash Collateral alone. Without the

---

[5] Indeed, the next scheduled payroll payment is set to leave the Debtors' accounts on Tuesday, March 17, 2020. Without authorization to use cash collateral, the Debtors will be unable to satisfy the administrative expenses attendant with the reorganization of their businesses under chapter 11.

Court's authorization to use Cash Collateral, the Debtors will be unable to satisfy the administrative expenses attendant with the reorganization of their businesses under chapter 11.

26. In short, the Debtors' business has no chance of surviving if the Debtors are not authorized to use Cash Collateral and do not receive any of the revenues resulting from the post-petition goods and services to their customers. If the Debtors' Chapter 11 Cases are converted to a chapter 7 case, unsecured creditors will likely receive no recoveries. On the other hand, if the Debtors are permitted to use cash collateral and can survive until a successful sale, such a sale will enhance the value of the collateral and improve results for all creditors.

### iii. Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (II) Granting Related Relief (the "Cash Management Motion")

27. Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management system; (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business; and (b) granting related relief.

28. The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow. The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.

29. Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing Cash Management System remain in place. I believe that the relief requested in the Cash Management Motion is in the best

11

HF 13130525v.6

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

### iv. *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion")*

30. Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (authorizing the Debtors to maintain and administer their customer-related programs (collectively, the "Customer Programs") as described in the motion and honor certain prepetition obligations related thereto and (b) granting related relief.

31. The Debtors have historically provided certain incentives, coupons, discounts, and accommodations to their customers to attract and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Accordingly, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases, and is necessary to maximize value for the benefit of all the Debtors' stakeholders.

32. I believe that continuing to administer the Customer Programs without interruption during the pendency of the Chapter 11 Cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates. In contrast, if the Debtors are unable to continue the Customer Programs post-petition or pay amounts due and owing to customers, the Debtors risk alienating certain customers and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects of maximizing the value of their estates. The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

33. I believe that the failure to honor Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the Chapter 11 filings. Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy.

34. I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of the Debtors' businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the Chapter 11 Cases.

> ### *v. Debtors' Motion Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services; and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service (the "Utilities Motion")*

35. Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) determining adequate assurance of payment for future utility services; (b) establishing procedures for determining adequate assurance of payment for future utility services; and (c) prohibiting utility providers from altering, refusing, or discontinuing utility service.

36. In connection with the operation of their businesses, the Debtors obtain electricity, natural gas, water, sewage, and other similar services. On average, the Debtors spend approximately $15,000 each month on utility costs and estimate that approximately $20,000 worth of utility costs are outstanding as of the Petition Date.

37. Preserving the Debtor's utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and contemplated sales process. Any interruption in utility services would disrupt the Debtors' ability to continue operations and service their customers. This disruption would adversely impact the Debtors' customer and vendor relationships and would

result in a decline in the Debtors' revenues. It would also affect the value of the Debtors' inventory—particularly items like perishable and frozen goods. Such a result could seriously jeopardize the Debtors' sale efforts and, ultimately, creditors' recoveries in these Chapter 11 Cases. Therefore, it is critical that utility services continue uninterrupted during the duration of the Debtors' Chapter 11 Cases.

38. The Debtors also propose to deposit into a segregated account a sum equal to the cost of two weeks' worth of the average utility cost for each utility provider based on the Debtors' average usage for the 2019 fiscal year.

39. Finally, the Debtors seek to establish Adequate Assurance Procedures to govern if any of the Debtors' utility providers believes that it is entitled to additional adequate assurance based on particular circumstances.

### vi. Debtors' Motion For Authorization to Pay Certain Prepetition Taxes and Fees (the "<u>Taxes Motion</u>")

40. The Debtors request authority to pay certain taxes, assessments, fees, and other charges in the ordinary course of business, regardless of whether such obligations accrued pre-petition or post-petition, including any such taxes, assessments, fees, and other charges subsequently determined upon audit or otherwise determined to be owed.

41. In the ordinary course of business, the Debtors incur and/or collect Taxes and Fees to various governmental authorities. The Debtors must continue to pay Taxes and Fees to avoid potential costly distractions during these Chapter 11 Cases. Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the governmental authorities could file liens or seek to lift the automatic stay. Accordingly, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estate, their creditors, and all other parties in interest.

> vii. *Debtors' Motion for (I) Authorization to (A) Continue to Maintain their Insurance Policies and Programs and Surety Bond Program and (B) Honor All Obligations With Respect Thereto; (II) Modification of the Automatic Stay with Respect to the Workers' Compensation Program; and (III) Related Relief (the "<u>Insurance Motion</u>")*

42. By the Insurance Motion, the Debtors request (i) authority, but not direction to (a) continue to maintain, and renew, in their sole discretion, their Insurance Policies and Programs, including the Workers' Compensation Program and the Debtors' Premium Financing Agreements and the Surety Bond Program, (b) honor their Insurance and Surety Obligations (as defined below) in the ordinary course of business during the administration of these chapter 11 cases, (c) pay any prepetition Insurance and Surety Obligations, including, without limitation, amounts owed under the Premium Financing Agreements and to the Insurance Service Providers, if any; (ii) modification of the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program; and (iii) related relief.

43. The Debtors Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets. I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies, is required by diverse regulations, laws, and contracts. Failure to make payments required by the Debtors' Insurance Policies could have a significant negative impact on the Debtors' operations.

44. The Debtors believe they are current as of the Petition Date with any fees and premiums owed as part of their Insurance Policies and Programs. Out of an abundance of caution, however, the Debtors seek authority to pay any prepetition Insurance and Surety Obligations.

45. I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estate, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

    *viii.    Debtors' Application for Appointment of Stretto as Claims and Noticing Agent (the "Stretto Retention Application")*

46. Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order (a) appointing Stretto ("Stretto") as claims and noticing agent for the Debtors and their Chapter 11 Cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases, and (b) granting related relief.

47. Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Stretto to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interests of the Debtors' estate. Moreover, it is my understanding that, based on all engagement proposals obtained and reviewed, Stretto's rates are competitive and comparable to the rates charged by their competitors for similar services.

48. The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Chapter 11 Cases. In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 15th day of March 2020

                                                          */s/ Daniel Scouler*
                                                          Daniel Scouler
                                                          Chief Restructuring Officer of Ample Hills Holdings, Inc. and its Affiliated Debtors